# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL NO. 5:05CV202-H

| | |
|---|---|
| DONALD R. MCKITTRICK,                )<br>            Plaintiff,            )<br>                                     )<br>        vs.                          )<br>                                     )<br>JO ANNE B. BARNHART,                 )<br>Commissioner of Social               )<br>Security Administration,             )<br>            Defendant.               )<br>_____) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #11) and "Memorandum in Support ..." (document #12), both filed February 4, 2006; and Defendant's "Motion For Summary Judgment" (document #13) and "Memorandum in Support of the Commissioner's Decision" (document #13), both filed April 5, 2006. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security benefits is supported by substantial evidence. Accordingly, the undersigned will deny Plaintiff's Motion for Summary Judgment; grant Defendant's Motion for Summary Judgment; and affirm the Commissioner's decision.

## I. PROCEDURAL HISTORY

On April 1, 2002, the Plaintiff filed an application for Social Security Disability benefits ("DIB") and Supplemental Security Income ("SSI"), alleging he was unable to work as of March 1,

2002, due to "high tibial surgery done on right knee[,] also cartilage repair and bone cutting, [resulting in] [in]ability to walk and stand for long periods of time." (Tr. 74.)  The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on May 13, 2004.  On December 17, 2004, the ALJ issued a decision denying the Plaintiff's claim. The Plaintiff subsequently filed a timely Request for Review of Hearing Decision.   On April 15, 2005, the Appeals Council denied the Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on May 17, 2005, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Relevant to the present appeal, the Plaintiff was 44 years-old at the time of the hearing, had an eighth grade education, and had relevant work experience repairing looms in a cotton mill, working in the kitchen of a restaurant, caring for plants at a greenhouse, working in a steel plant, and rebuilding electrical transformers, each of which required standing and walking eight hours a day and lifting over 100 pounds on a frequent basis.

The Plaintiff testified at the hearing that he was unable to engage in any sustained work activity due to severe pain in his back, right knee, and right ankle; that after he walked 50 feet, his ankle swelled requiring him to lie down with his foot elevated;  that due to the pain, he was unable "to think straight" or sleep at night; that he was unable to perform any household chores or any yard work (although as discussed below, he told his doctors that he exercised regularly); that he did not drive, having lost his driver's license in 1995 after being convicted twice of driving while impaired;

2

that he had not seen doctors due to his finances and lack of insurance; and that he had not had recommended surgeries for his right knee or back because he wanted to get further medical opinions.

A Report of Contact, dated May 3, 2002, reflects that the Plaintiff's wife, Debbie McKittrick, stated that the Plaintiff was able to concentrate well enough to read and watch television.

In assessing the claimant's residual functional capacity ("RFC"), medical experts for North Carolina Disability Determination Services ("NCDDS") opined that the claimant could perform medium exertional work which did not involve working at unprotected heights or around dangerous moving equipment. Specifically, it was found that the severe standing and walking limitations the Plaintiff demonstrated at the time of the consultative examination on August 23, 2002, discussed below, were not consistent with the objective medical evidence of record, that is, the claimant had full range of motion of the knees, and X-rays revealed only mild osteoporosis of the right knee, an old fracture with minimal deformity, a mild degree of osteoarthritis, and no significant joint effusion.

The parties have not assigned error to the ALJ's recitation of the medical records (presented to the ALJ at or after the hearing). Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> In the present case, the claimant underwent surgery to his right knee on September 21, 2001 consisting of right knee arthroscopy, debridement of a medical meniscus tear, micro fracture of the medical femoral condyle and medial tibial plateau and high tibial osteotomy with placement with Orethofix external fixator on September 21, 2001 performed by Dr. Thomas J. Noonan. The post-operative diagnosis was right knee varus malalignment, Grade 4 chondral defects medial tibial plateau and medial femoral condyle and medial meniscus tear. On December 14, 2001, his external fixator of the right leg was removed. X-rays showed no motion at the osteotomy site (EX 3F at 2). Following this surgery, the claimant regained a range of motion of 0 to 135 by December 27, 2001. His gait remained antalgic, but he was instructed by Dr. Noonan to do as much walking as possible and to get off the crutches. He was released to return

to sedentary work (EX IF at 3).

There is no evidence from December 27, 2001 until August 23, 2002 to demonstrate that the claimant was unable to effectively ambulate. In fact, he returned to his past work as a loom fixer, a position which required a medium exertional effort and extensive standing and walking.

He was seen on only one occasion in 2002 by the consultative examiner on August 23, 2002. X-rays of his right knee on August 23, 2002 revealed no acute fracture or dislocation. There was some degree of osteoporosis. The claimant was noted to have an old healed fracture at the proximal tibia seen with only minimal degree of deformity. There was a mild degree of osteoarthritis seen with narrowing of the articular space on the medical aspect. No significant joint effusion was seen (EX 5F at 6).

The consultative examination of the claimant on August 23, 2002 showed the claimant to have a full range of motion in his spine. He used a cane to ambulate. His right knee appeared stable. He had 0 to 150 degrees of motion in his right knee as he did in the left. He had no dorsiflexion in his right ankle and no plantar flexion, inversion and eversion of the right ankle was 10 degrees. He displayed tremendous difficulty with heel/toe walking and getting on and off the examination table. He appeared to have lost the ability to flex and extend his right ankJe (EX 5F at 2 and 3). X-rays of the right ankle and foot on October 10, 2002 showed post osteotomy of the distal third of the fibula. The ankle mortise was intact. There was no evidence of acute change in the ankle mortis. The bones were somewhat demineralized. View of the right foot revealed demineralization. There were mild degenerative changes present in the bones of the foot but no evidence of acute fracture of other osseous abnormality was seen (EX 6F at 2)....

The record shows that the claimant injured his back on or about April 21, 2004. He was diagnosed with degenerative disc disease in May 2004. A MRI showed a large L4-5 central disc herniation with a large right L5-S1 disc herniation along with severe degenerative disc disease. Neurological examination on May 21, 2004 showed his gait to be abnormal, the claimant ambulating in a stooped forward position. There was some lumbosacral tenderness to palpation. Sensation was intact to pinprick. Deep tendon reflexes were 2+ in the knees and trace in the ankles. Straight leg raising was positive on the right at 80 degrees. Toes were down going and there was no clonus. The claimant was felt to be a poor surgical candidate secondary to his chronic degenerative changes and pain. An epidural steroid injection was going to be tried along with physical therapy. If conservative treatment failed and the claimant required surgery, Dr. Wilson felt that a two-level diskectomy and posterior lumbar interbody fusion with pedicle screws would best manage his condition. The claimant was to contact his office if his symptoms worsened (EX 13F)....

Dr. Noonan's records document instability and giving away of the right knee prior to the September 2001 surgery (EX IF). The record after the surgery does not document the repeated giving away alleged or the falls alleged by the claimant. There is no evidence of any swelling in 2002 of his right lower extremity. The claimant had no treatment from his orthopedic surgeon in 2002. He sought medical evaluation of his bilateral knee and leg pain and right foot pain on September 2, 2003, 18 months after his alleged onset of disability. He told Dr. William Craig HI M.D. on September 2, 2003 that his pain was a 5 on a scale of 0 to 10, with 10 being the worse pain imaginable. On physical examination, the claimant had a full range of motion of the knee. Dr. Craig noted that the claimant's knee felt stable to varus and valgus stress. His posterior drawer was stable. His Lachman was 7 to 8 mm. with a soft endpoint. He had some medial joint line tenderness. He had some tenderness over his distal lateral leg over the side of his fibular osteotomy. He had Tinels' at this site which caused burning pain down into his fourth toe. His motor friction was normal. He had subjective decreased sensation over the dorsal lateral foot. Examination of the left leg showed no swelling or deforming. He had neutral to slightly varus alignment at the knee. He had a full range of motion of the knee. His knee was stable. On review of X-rays of the claimant's right knee, Dr. Craig found the mortise to be well-aligned. There was an incision of the distal third of the fibula. Two views of the tibia showed his tibia to be normal. The impression was right knee pain, try to rule out loose body/meniscal tear and right foot and ankle pain, probable superficial peroneal nerve pain. Dr. Craig obtained an EMG and nerve conduction study of the claimant's right lower extremity, which demonstrated a superficial peroneal nerve conduction block. Dr. Craig explained to the claimant that he felt that the claimant's foot pain was likely related to some scar tissue around his superficial peroneal nerve. A MRI revealed a tear of the posterior horn of the medial meniscus. Dr. Craig recommended a right knee arthroscopy to repair the medical meniscal tear and exploration and release of the scar tissue (EX 10F).

Dr. T. Cate Trate examined the claimant on September 3, 2003 prior to performing the nerve conduction study. Dr. Trate observed that the claimant's back pain did not correlate with the right leg pain ad paresthesias. His brief examination of the claimant was remarkable for decreased sensation primarily in the right superficial peroneal distribution with decreased eversion. There was mild weakness in dorsiflexion and great toe extension. There was tenderness with palpation of the right fibular neck region. Reflexes in the lower extremity were symmetric. As noted above, the study showed evidence of conduction block of the right superficial peroneal nerve (EX 9F).

The record reflects that the claimant has not had further surgery to his knee. In April 2004, he was seen by Dr. Chauncey B. Santos, M.D. on April 6, 2004 and April 27, 2004. On April 6, 2004, Dr. Santos noted that the claimant was doing his exercises (quadriceps and hamstring strengthening exercises) and taking his medication, Celebrex. The medication was helping ease his pain. The claimant reported positive knee swelling, but no knee locking or giving way or any knee instability. Examination

revealed the claimant to be walking with a limp on the right. He had a full range of active and passive motion of the right knee. No redness or swelling was seen. No instability was found on examination. He had positive moderate tenderness of the joint line. Further examination of the right leg revealed no swelling, no tenderness, no muscle atrophy, no palpable mass and a negative Homan test (EX 12F).

On April 27, 2004, Dr. Santos noted that the claimant was being evaluated for back pain. The claimant related that when he had twisted to throw a shovel into the back of his truck, he felt a sharp pain in his lower back and fell to the ground. He had no history of back pain prior to this event. A MRI of the lumbar spine showed a herniated disc between L4-L5 with impingement. Examination showed severe spasm of both of the paraspinal muscles between LI-SI vertebrae. His extremities had full range of motion in all the joints. His reflexes were all normal. His extremities had no neurocirculatory deficit. He had no extensor hallucis longus tendon weakness. He had positive straight leg raising in both lower extremities at 30 degrees. Dr. Santos diagnosed the claimant as having lumbar strain and HNP L4-5. Darvocet and Flexeril were prescribed. He was referred to physical therapy for electrical muscle stimulation, ultrasound and hot packs of his lumbosacral spine, three times a week for two weeks (EX 12F).

When seen by Dr. John A. Wilson, a neurosurgeon, on May 21, 2004, the claimant complained of pain of 10 on a scale of 1 to 10. He stated he was in excruciating pain. However, he was taking no medications at the time of the examination and had been off steroids, Indocin and Darvocet. As previously noted, Dr. Wilson felt the claimant was a poor surgical candidate and recommended an epidural steroid injection and physical therapy.

As to treatment modalities, there is no evidence that the claimant participated in any physical therapy from March 2002 through the present date. Specifically, no physical therapy as recommended by Dr. Santos or Dr. Wilson is documented in the present record. He is reluctant to have any further surgery. No evidence of epidural steroid injections to his back, physical therapy, use of a TENS unit or other treatment modalities is shown.

As to effectiveness of medications and any adverse side effects, the claimant was on no medications at the time Dr. Noonan released him for sedentary work on December 27, 2001 (EX IF at 2). He was only taking Tylenol P.M. as needed at the time of the August 23, 2002 consultative examination (EX 5F at 2). Dr. Santos initially prescribed Celebrex in April 2004. On April 27, 2004, he prescribed Darvocet N-100, one tablet to be taken every 8 hours as needed for pain and Flexeril 10 mg. twice a day. He specified 45 tablets of Darvocet and 30 tablets of Flexeril be dispensed or approximately a 15 day supply (EX 12F). He was again taking no medications as of May 24, 2004 (EX 13F at 2). At the time of his hearing, the claimant reported on his list of medications that he was taking a blood pressure pill, Norvasc; a pill for high

cholesterol, Lipitor; Oxaprozin (or Daypro) 600 mg. twice a day, an non-steroidal antiinflammatory pain medication prescribed in July 2003 for leg pain and Neurontin 100 mg. one tablet at bedtime for leg pain. These medications were prescribed by Sonya Rogers. There are no corresponding medical records from Sonya Rogers to support the claimant's allegations that he is experiencing significant side effects from his medications. The claimant has not taken the type or quantity of pain medications associated with a severe, intractable pain syndrome.

(Tr. 16-20.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff suffered chronic anterior cruciate ligament ("ACL") deficiency with medial compartment arthritis of the right knee, status post right knee arthroscopy and

---

[1] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

8

high tibial osteotomy of the right knee, osteoarthritis, degenerative disc disease with a central herniation of L4-5, and a history of nicotine abuse, which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was unable to perform his past relevant work; that the Plaintiff was a "younger individual" with a "limited education" and no transferable skills; that the Plaintiff had the residual functional capacity for a "sedentary work";[2] and that Medical-Vocational Rule 201.25 mandated a finding of "not disabled."

On appeal, the Plaintiff essentially contests his residual functional capacity. See Plaintiff's "Motion for Summary Judgment" (document #11) and "Memorandum in Support ..." (document #12). However, the undersigned finds that there is substantial evidence supporting the ALJ's finding concerning the Plaintiff's residual functional capacity, and his ultimate determination that the Plaintiff was not disabled.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged

---

[2]Sedentary work involves lifting no more than 10 pounds at one time and occasionally lifting and carrying items such as docket files, ledgers, and small tools. See 20 C.F.R. § 416.967(a); SSR 83-10. Sedentary work is performed primarily in a seated position, but occasional walking and standing is often required. 20 C.F.R. § 416.967(a); SSR 83-10. "Occasionally" means from very little up to 2 hours out of an 8-hour work day. SSR 83-10.

9

impairments limited his ability to work. Agency medical experts determined that the Plaintiff had the residual functional capacity for medium work – could occasionally lift 50 pounds and frequently lift 25 pounds; that he could sit, stand, and/or walk 6 hours in an 8-hour workday; and that his ability to push and/or pull was unlimited – with the only nonexertional limitations of avoiding working at heights, near hazards, or with dangerous machinery. The ALJ found the Plaintiff not disabled, however, based on his ability to perform <u>sedentary</u> work.

Moreover, the undersigned notes that none of the Plaintiff's treating physicians ever opined that he was unable to work. Indeed, rather than proving the existence of a disability, the undisputed medical record, recited above, clearly supports the ALJ's essential conclusion: that Plaintiff suffered from – but was not disabled by – chronic ACL deficiency with medial compartment arthritis of the right knee, status post right knee arthroscopy and high tibial osteotomy of the right knee, osteoarthritis, degenerative disc disease with a central herniation of L4-5, and a history of nicotine abuse. After undergoing knee surgery on September 21, 2001, and removal of an external fixator on December 14, 2001, Plaintiff was cleared to return to work on December 27, 2001, which he did until his alleged onset date of March 1, 2002. The record is devoid of any further treatment of Plaintiff's alleged knee and ankle difficulties, or his allegations of severe pain until August 23, 2002, when X-rays revealed that Plaintiff's right knee had only a minimal degree of deformity, no evidence of effusion, and mild osteoarthritis, and Dr. Kovacich noted that Plaintiff's only medication was Tylenol PM and that he had 150 degrees of motion in both knees. X-rays of Plaintiff's right ankle taken on October 10, 2002 showed that Plaintiff's right ankle mortise was intact with no evidence of any acute change.

On April 27, 2004, although an MRI of the lumbar spine showed a herniated disc between L4-5 with impingement, Dr. Santos found that Plaintiff had full range of motion in all extremities, his

reflexes were all normal, his extremities had no neurological deficit, and he had no extensor hallucis longus tendon weakness. Further, Dr. Santos recommended only conservative care in the form of physical therapy for electrical muscle stimulation, with ultrasound and hot packs three times a week for two weeks. Similarly, on May 21, 2004, in response to Plaintiff's complaints of "excruciating" back pain, Dr. Wilson recommended conservative care in the form of an epidural steroid injection and physical therapy. Although at the hearing, he denied being able to do house or yard work, the Plaintiff told Dr. Santos that he was able to exercise regularly. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into

account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's chronic anterior cruciate ligament (ACL) deficiency with medial compartment arthritis of the right knee, status post right knee arthroscopy and high tibial osteotomy of the right knee, osteoarthritis, degenerative disc disease with a central herniation of L4-5, and a history of nicotine abuse – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of [his] pain, and the extent to which it affects [his] ability to work," and found Plaintiff's subjective description of his limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's testimony and his statements to his doctors, as well as between his claims of inability to work and his objective ability to carry on a moderate level of daily activities, that is, Plaintiff's ability to exercise, read, and watch television. Moreover, after his initial knee

surgery, the Plaintiff's impairments were treated conservatively and, as the ALJ noted, the Plaintiff did "not take[] the type or quantity of pain medications associated with a severe, intractable pain syndrome." (Tr. 20.)

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by his combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. Plaintiff's "Motion For Summary Judgment" (document #11) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #13) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: April 12, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge